# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3861

_____

| | | |
|---|---|---|
| Abdel Elnashar, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Speedway SuperAmerica, LLC, | * | Appeal from the United States |
| | * | District Court for the |
| Defendant - Appellee, | * | District of Minnesota. |
| | * | |
| United States Department of Justice; | * | |
| Federal Bureau of Investigation, | * | |
| Minneapolis Office, | * | |
| | * | |
| Interested Parties - Appellees. | * | |

_____

Submitted: December 13, 2006
Filed: April 26, 2007

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

This appeal is the culmination of a four-year span of litigation involving Abdel Elnashar, his former employer Speedway SuperAmerica, the FBI, and the Department of Justice. The heart of the litigation is Elnashar's claim that SuperAmerica discriminated against him on the basis of his Arabic race in the wake of the September 11, 2001, terror attacks. Throughout the litigation, he has planned to prove

SuperAmerica's discriminatory intent by seeking certain confidential FBI files, which he believes show that a SuperAmerica employee falsely informed the FBI that he was engaged in bomb-making activities. The district court[1] denied his motion to compel the FBI to produce the files, denied his motion for a continuance, and granted summary judgment to SuperAmerica on the employment discrimination claims. We affirm.

I.

Elnashar is an Arab-American, born in Egypt, and is a Muslim. He was hired as a manager trainee at the Bloomington, Minnesota, Speedway SuperAmerica store in the summer of 2001. Manager trainees may have the opportunity to become store managers after they complete various performance goals, and Elnashar hoped to become a SuperAmerica store manager. In September 2001, he was transferred to the Rice Street store in St. Paul, to assist a new manager who had recently been promoted from a manager trainee position. In November, he requested to be transferred to a store where he could work with a more experienced manager. The district manager, Mark Erickson, transferred Elnashar to the Seventh Street store in St. Paul, where he worked with store manager Anne Stehr and associate manager Jean Schneider. While he was at the Seventh Street store, Elnashar's position changed from manager trainee to assistant manager trainee. His corporate allotment of manager trainee hours had run out and, based on reports from Elnashar's supervisors at the Bloomington and Rice Street stores, Erickson did not believe Elnashar was ready for promotion to a manager position at that time. In addition, Elnashar's scheduled hours were cut from full time to sixteen hours per week in early 2002. SuperAmerica attributes the reduction to a company policy of reducing employees' hours in the slow post-holiday season, as well

_____

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

-2-

as Elnashar's expressed desire to work fewer hours, but Elnashar denies requesting a reduction in hours.

Elnashar also experienced interpersonal difficulties with associate manager Schneider at the Seventh Street store. His work was not as focused on managerial training as he would have liked; instead, Schneider asked him to perform tasks a cashier could do, such as mopping the floor, and belittled him in front of coworkers and customers. In addition, Schneider asked him if he had a harem, how many wives he had as a Muslim, and whether he rode camels around everywhere in Egypt. Elnashar also reports that Schneider made unwelcome body contact with him when they were working together in close quarters. According to Schneider, Elnashar was rude to her and others, refused to perform certain tasks and work certain shifts, and walked out of his shifts at least twice after losing his temper during arguments with her. In March 2002, after one employee told Schneider that she felt Elnashar was harassing her because of her race, Schneider reported the complaint to Erickson, who issued Elnashar a written warning for refusing to perform shift duties, leaving his shift, and creating a hostile work environment. Erickson asked Elnashar to sign the warning, but he protested and left work. He did not return to work in the following days but waited for Erickson to "call [him] and set things straight." That call never came, and SuperAmerica ultimately classified Elnashar as having voluntarily resigned by abandoning his job.

Shortly after these events, in the spring of 2002, FBI agents visited Elnashar's former supervisors at the SuperAmerica stores to inquire about his address and background as part of its PENTTBOM investigation into the September 11, 2001, terror attacks. Schneider and Stehr were incorrect in some of the background information they gave the FBI, particularly regarding where Elnashar grew up. In April 2002, two FBI agents came to Elnashar's home, questioned him about whether he was engaged in making bombs, and searched his house. They found nothing suspicious and told him that the investigation would be closed. According to

Elnashar, one of the agents, Myron Umbel, told him that someone from Speedway SuperAmerica had called the FBI to report that Elnashar was making bombs.

Elnashar filed suit against SuperAmerica for employment discrimination on October 10, 2002. He argued that SuperAmerica failed to promote him, demoted him, and constructively discharged him because of his race, in violation of 42 U.S.C. §§ 1981, 1981a, and 2000e-2000e(17).[2] On the basis of Agent Umbel's tip that a SuperAmerica employee was the informant who falsely told the FBI he was making bombs, Elnashar embarked on a quest to obtain proof of the informant's identity to show SuperAmerica's racial animus against Arabs. Elnashar's various attempts to obtain this information all have been unsuccessful, as recounted below in the convoluted procedural history of this case.

Elnashar first requested by letter in February 2003 that the FBI send him the records of his investigation. The FBI treated this as a request for access under the Freedom of Information Act (FOIA) and the Privacy Act and denied it, invoking the FOIA law enforcement exemption and Privacy Act protection for the informant's identity. Elnashar initially did not seek administrative appeal of this decision. Rather, he served a subpoena on the FBI demanding the records and Agent Umbel's testimony and filed a motion to compel production. The magistrate[3] denied this motion because Elnashar had not exhausted his administrative remedies, i.e. the Department of Justice procedures formulated in response to United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), which establish a chain of command for determining whether Department

---

[2]Elnashar also initially alleged national origin and religious discrimination, as well as violations of Minnesota employment statutes, but he abandoned the national origin and religious discrimination claims in the district court and abandoned his state law claims by failing to raise them in his briefs to this Court. See Griffith v. City of Des Moines, 387 F.3d 733, 739 (8th Cir. 2004).

[3]The Honorable Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

of Justice employees will disclose confidential material, id. at 468. After this ruling, Elnashar followed the Touhy procedures and resubmitted his request to the FBI. He obtained a redacted copy of his FBI record, but the FBI still refused to disclose the informant's identity. Elnashar served a Rule 30(b)(6) subpoena for the files, specifically demanding to learn the identity of the informant and whether he or she was employed by SuperAmerica, and he moved the court to compel production. The FBI objected, citing several grounds including the common law confidential informant privilege and Touhy regulation 28 C.F.R. § 16.26(b)(4). The magistrate reviewed the unredacted files in camera and ultimately denied Elnashar's motion to compel in her Order of September 7, 2004, concluding that the FBI did not abuse its discretion in refusing to disclose the material on the basis of the confidential informant privilege where the files showed that the informant had been assured confidentiality and Elnashar's need for the informant's identity was speculative. The magistrate also concluded that the Touhy regulations were valid. The district court affirmed on October 29, 2004. Elnashar immediately appealed that decision to this Court, and we held that we lacked jurisdiction to rule on the interlocutory order.[4] Elnashar v. Speedway SuperAmerica, LLC, 446 F.3d 796 (8th Cir. 2006).

While his discovery motions were pending in his suit against SuperAmerica, Elnashar also filed a separate lawsuit against the Department of Justice, the FBI, Agent Umbel, and other unknown FBI agents seeking expungement of his record, access to his record, and damages under the Privacy Act, FOIA, and several constitutional amendments. The district court granted summary judgment to the defendants. This Court affirmed. Elnashar v. United States Dep't of Justice, 446 F.3d 792 (8th Cir. 2006).

---

[4]Now that the district court has granted summary judgment to SuperAmerica, the denial of Elnashar's motion to compel is properly before us.

Elnashar's inability to obtain the FBI files and to depose Agent Umbel also prompted him to request a stay of SuperAmerica's motion for summary judgment while his appeal of the interlocutory order was pending. The district court denied this request, treating it as a motion for a continuance under Federal Rule of Procedure 56(f). The district court found that Elnashar had not shown good cause for his failure to depose Agent Umbel during the two years his suit had been pending and that he had not shown that the information was likely to raise a genuine issue of material fact on his discrimination claims.

With the discovery motions resolved, the district court granted SuperAmerica's motion for summary judgment on Elnashar's substantive race discrimination claims on September 22, 2005, finding that many of the events Elnashar experienced at SuperAmerica were not adverse employment actions, Elnashar failed to show that SuperAmerica's legitimate nondiscriminatory reasons for its actions were pretextual, and Elnashar's experiences did not rise to the level of actionable harassment on his hostile environment claim.[5]

---

[5]Elnashar challenges the district court's analysis of his race discrimination claims only in his reply brief, focusing entirely on the continuance, discovery, FOIA, and Privacy Act issues in his opening brief. We have discretion to refuse to consider issues an appellant fails to raise in his or her initial brief, but we will review the grant of summary judgment to SuperAmerica on the discrimination claims in this case where SuperAmerica has fully addressed those claims in its brief and Elnashar's opening brief states that he appeals the grant of summary judgment. See United States v. Head, 340 F.3d 628, 631 n.4 (8th Cir. 2003).

## II.

### A. Discovery Motions

Elnashar appeals all orders denying his attempts to learn the identity of the informant whose tip prompted the FBI to investigate him. These orders include the district court's order denying his motion to compel the FBI to produce the relevant files and Agent Umbel's testimony and its denial of his motion for a continuance. In addition, Elnashar expends substantial efforts in his brief challenging the district court's grant of summary judgment to the Department of Justice and FBI on his FOIA and Privacy Act claims. We already have reviewed and affirmed the district court's judgment on these claims, 446 F.3d at 793, which Elnashar raised in a separate lawsuit and which are not part of the final order from which he now appeals in his suit against SuperAmerica. As we cannot revisit Elnashar's FOIA and Privacy Act claims in this appeal, our review is limited to the October 29, 2004, denial of his motion to compel and the February 15, 2005, denial of his motion for a continuance.

### 1. Motion to compel

We generally review the denial of a motion to compel production of evidence for gross abuse of discretion. Toghiyany v. AmeriGas Propane, Inc., 309 F.3d 1088, 1093 (8th Cir. 2002). Even under the ordinary abuse of discretion standard we have applied in criminal cases to a district court's refusal to require disclosure of a confidential informant's identity, see United States v. Crenshaw, 359 F.3d 977, 1005 (8th Cir. 2004), Elnashar's appeal fails.

The district court summarily affirmed the magistrate's order denying Elnashar's motion to compel the FBI to disclose the informant's identity. In explaining why Elnashar was not entitled to this information, the magistrate accepted the FBI's contention that the informant's identity was privileged under Roviaro v. United States,

353 U.S. 53 (1957). The <u>Touhy</u> regulations under which the FBI refused to disclose the informant's identity track the common law informant's privilege. 28 C.F.R. § 16.26(b)(4). To override the informant's privilege, Elnashar would have to show that he had a clear need for the informant's identity, weighed against the government's interest in protecting confidential informants' identities. <u>United States v. Lapsley</u>, 334 F.3d 762, 763-64 (8th Cir. 2003). An individual seeking disclosure has a need for the informant's identity where it would be material to his case; that is, there must be a reasonable probability that the evidence would change the outcome. <u>Id.</u> at 764. After reviewing the unredacted FBI files <u>in camera</u>, the magistrate concluded that Elnashar had not met his burden. She reasoned that the materiality of the information was minimal, and thus Elnashar's need for the information was weak, because the informant did not allege that Elnashar was making bombs or was engaged in other terroristic activities. Meanwhile, the government had a strong interest in maintaining the confidentiality of informants' identities to encourage individuals to provide information to law enforcement without fear of reprisal. As the magistrate observed, the government's interest is more likely to prevail in civil cases like Elnashar's, because the countervailing constitutional guarantees assured to criminal defendants are not present. <u>See</u> <u>Lawmaster v. United States</u>, 993 F.2d 773, 774-75 (10th Cir. 1993); <u>see also</u> <u>Dole v. Local 1942, Int'l Bhd. of Elec. Workers</u>, 870 F.2d 368, 372 (7th Cir. 1989) (interest of party seeking to discover informant's identity must be "credible"). Finally, the magistrate rejected Elnashar's invitation to invalidate the <u>Touhy</u> regulations.

We see no abuse of discretion, gross or otherwise, in the district court's decision to affirm the magistrate's denial of Elnashar's motion to compel. Elnashar argues that the magistrate incorrectly placed the burden on him to show need for the information, where she first should have required the FBI to show that the informant's identity was indeed privileged by proving that the informant had been promised confidentiality, citing <u>Department of Justice v. Landano</u>, 508 U.S. 165 (1993). While <u>Landano</u> held that the FBI is not entitled to a presumption that all informants are confidential for

purposes of FOIA exemptions, id. at 181, the magistrate afforded the FBI no such presumption in ruling on this Fed. R. Civ. P. 45 motion to compel, and the evidence supports her conclusion that the informant was confidential. The in camera review of the FBI files showed that the government intended to protect the informant's identity, and even the redacted documentation of the informant's interview contains a "protect identity" notation, which, according to FBI Special Agent Nancy Schuster, means the informant provided information to the FBI only after receiving assurances that the FBI would protect his or her identity. This is sufficient to support application of the confidential informant's privilege. Next, Elnashar argues that the court gave undue weight to the government's interest in protecting informants' identities at the expense of his interest in obtaining evidence that might have proven the intent element of his discrimination claims. Contrary to Elnashar's argument, the magistrate fully considered his need for the evidence and found it to be speculative. Even if disclosure of the informant's identity would confirm Elnashar's suspicion that the informant was a SuperAmerica employee, he still would have to show that the informant's statements showed anti-Arab animus and connect that discriminatory intent to adverse employment actions at SuperAmerica. The magistrate's in camera review revealed that the informant did not accuse Elnashar of making bombs or other terroristic activities, substantially weakening his theory that the informant falsely accused him of being a terrorist and that this showed SuperAmerica's animus against Arabs in the wake of September 11. Thus, the magistrate correctly found that Elnashar had no clear need for the informant's identity.

We also reject Elnashar's argument that the district court abused its discretion by upholding the Touhy regulations, which enable the Attorney General to prevent employees from disclosing information that "would reveal a confidential source or informant," 28 C.F.R. § 16.26(b)(4). Elnashar contends that these regulations exceed the agency's authority, because the enabling act does not authorize the DOJ to create substantive regulations that "withhold[] information from the public or limit[] the availability of records to the public," 5 U.S.C. § 301. Elnashar's contention is

misplaced. While the language he cites does constrain the Attorney General from claiming an executive privilege on the basis of 5 U.S.C. § 301, see Kwan Fai Mak v. FBI, 252 F.3d 1089, 1092 (9th Cir. 2001), it does not purport to eliminate specific claims of privilege that exist under the common law. The regulation the FBI invokes in this case permissibly tracks the common law informant's privilege, 45 Fed. Reg. 83,208, 83,210 (Dec. 18, 1980) (Touhy regulations "identify several widely acknowledged areas of privilege or legally prohibited disclosure"). We affirm the district court's denial of Elnashar's motion to compel.

### 2. Motion for continuance

We review the denial of a motion for continuance under Fed. R. Civ. P. 56(f) for abuse of discretion. In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1489-90 (8th Cir. 1997). To obtain a continuance under Rule 56(f), the movant must show "good reason for being unable to present facts essential to its response." Alexander v. Pathfinder, Inc., 189 F.3d 735, 744 (8th Cir. 1999). In an affidavit in support of his motion for a continuance, Elnashar's attorney alleged that he needed more time either to depose Agent Umbel or obtain the unredacted FBI files containing the informant's identity to show SuperAmerica's racially discriminatory intent. The district court held that this affidavit did not show good reason for a continuance, because it did not explain why Elnashar needed this evidence to survive summary judgment and because the court already had granted Elnashar two continuances during the two years that the lawsuit had been pending. The district court did not abuse its discretion in refusing to give Elnashar more time to obtain competent proof of the informant's identity. As discussed, Elnashar only speculated that the FBI files contained a smoking gun that would prove SuperAmerica's discriminatory animus. The file may have nothing to do with this case at all, so we cannot say that the informant's identity was "essential to [Elnashar's] response" to SuperAmerica's motion for summary judgment. See Alexander, 189 F.3d at 744. In addition, Elnashar had not made good use of the two continuances he had received

already; he served only one subpoena, which was returned undelivered, to locate and depose Agent Umbel. Elnashar blames the court and the FBI for his inability to locate Agent Umbel for deposition, pointing out that Umbel had been transferred and the court would not compel the FBI to give him Umbel's updated contact information. Elnashar has not shown that he made any effort, however, to obtain this information from other potential sources. Moreover, the FBI refused to facilitate Agent Umbel's deposition for the same valid reason it refused to provide Elnashar the unredacted file of his investigation--Elnashar's objective was to learn the informant's identity, which was a privileged matter. A continuance will not help Elnashar, because he does not have the right to compel Umbel to identify the witness. In sum, Elnashar showed no good reason to grant a continuance, and the district court correctly denied the motion.

## B. Discrimination Claims

Elnashar's substantive claims alleged that SuperAmerica discriminated against him because of his race by failing to promote him to the position of manager; demoting him in terms of work location, job title, and hours; reprimanding him; constructively discharging him; and subjecting him to a hostile work environment. The district court granted summary judgment to SuperAmerica on all claims. Mindful that summary judgment should be granted in employment discrimination cases only if the evidence could not support any reasonable inference of discrimination, we review the district court's grant of summary judgment de novo, affirming if there is no genuine issue of material fact and SuperAmerica is entitled to judgment as a matter of law. Peterson v. Scott County, 406 F.3d 515, 520 (8th Cir. 2005); Fed. R. Civ. P. 56(c). We view all the evidence in the light most favorable to the non-moving party, Elnashar, and draw all reasonable inferences in his favor. Peterson, 406 F.3d at 520.

Observing that both parties agreed that McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), provided the appropriate framework for analysis, the district court analyzed Elnashar's employment discrimination claims under this familiar standard.

In his reply brief, however, Elnashar contends that his is a "mixed-motive" case and that the district court should have modified the <u>McDonnell Douglas</u> standard in light of <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 101-02 (2003), allowing him to survive summary judgment if he raised a genuine issue of material fact that either SuperAmerica's asserted reasons for its decisions were pretextual or that unlawful discrimination was a motivating factor in its decisions. As we have held, however, <u>Desert Palace</u> is entirely consistent with our precedent under which a plaintiff survives summary judgment either by providing direct evidence of discrimination or by creating an inference of discrimination through the <u>McDonnell Douglas</u> framework. <u>Peterson</u>, 406 F.3d at 521; <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir. 2004). Elnashar has no direct evidence of discrimination. He points to associate manager Schneider's inquiries into whether he had a harem and rode camels in Egypt, but her comments do not raise a genuine issue of fact about whether unlawful discrimination was a motivating factor in SuperAmerica's decisions; her questions had no connection to the decisional process and are better characterized as stray remarks. <u>See</u> <u>Breeding v. Arthur J. Gallagher & Co.</u>, 164 F.3d 1151, 1157 (8th Cir. 1999). Thus, the <u>McDonnell Douglas</u> framework is the appropriate mode of analysis for Elnashar's claims, as the district court concluded.

Under the <u>McDonnell Douglas</u> framework, the plaintiff bears the initial burden of making out a prima facie case of discrimination. <u>McDonnell Douglas</u>, 411 U.S. at 802. To establish a prima facie case, the plaintiff must show that: (1) he belonged to a protected group; (2) he was qualified for the position in question; (3) he was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. <u>Tatum v. City of Berkeley</u>, 408 F.3d 543, 551 (8th Cir. 2005). Once the plaintiff carries his or her burden to make out a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its action. <u>Peterson</u>, 406 F.3d at 521. If the defendant satisfies its burden, then the plaintiff must show that the nondiscriminatory reason was a pretext for discrimination. <u>Id.</u>

1. Failure to promote

The district court rejected Elnashar's claim that SuperAmerica discriminated against him on the basis of his race when it promoted a white manager trainee instead of him to the position of manager at the Rice Street store. The court concluded that SuperAmerica asserted legitimate, nondiscriminatory reasons for not promoting Elnashar to manager because the individual it promoted had more relevant experience than Elnashar and Erickson had concerns that Elnashar was insubordinate. See Pope v. ESA Servs., Inc., 406 F.3d 1001, 1007 (8th Cir. 2005). It rejected all his theories of pretext. Elnashar does not contest the district court's judgment on his failure to promote claim in either of his briefs; thus we affirm on this issue.

2. Demotion

Elnashar alleges that SuperAmerica discriminated against him on the basis of his race by demoting him. Elnashar argues that his transfer to the Seventh Street store, change in job title from manager trainee to assistant manager trainee, and reduction in hours each amounted to a demotion. The district court held that the work location transfer was not an adverse employment action, and thus Elnashar failed to establish a prima facie case on that incident, because it did not entail a significant change in working conditions or a diminution in Elnashar's title, salary, or benefits. See Zhuang v. Datacard Corp., 414 F.3d 849, 854 (8th Cir. 2005). Indeed, there is no dispute that Elnashar wanted to be transferred to a store where he could work with a more experienced manager than the recently promoted manager at the Rice Street store, and Stehr was an experienced manager at the Seventh Street store. Elnashar was trained to perform new tasks at the Seventh Street store; his rate of pay did not change, and none of the evidence suggests his change in title, which occurred around two months after the transfer, had anything to do with the transfer. Thus, we affirm the district court's conclusion that Elnashar cannot make out a prima facie case that the transfer was an adverse employment action.

-13-

Elnashar's job title reclassification from manager trainee to assistant manager trainee, on the other hand, was an adverse employment action. SuperAmerica district manager Erickson admitted as much in his deposition. However, SuperAmerica offered legitimate, nondiscriminatory reasons for the reclassification--Elnashar's allotment of manager trainee hours had expired, and Erickson did not feel Elnashar was ready for promotion to manager because his supervisors had reported incidents of insubordination. On the issue of Elnashar's reduction in hours, SuperAmerica does not dispute that Elnashar established a prima facie case, but it offers its company policy of making store-wide reductions as a legitimate, nondiscriminatory reason for reducing Elnashar's hours.

Elnashar argues that SuperAmerica's reasons for changing his title and reducing his hours are pretextual, on several theories. First, he argues that certain statements by his coworkers show SuperAmerica's underlying discriminatory intent. According to Elnashar, Schneider inquired whether he had a harem and rode camels in Egypt. Elnashar has not connected these comments to Schneider's decisions about his schedule and has not shown that any other decisionmaker at SuperAmerica endorsed them, however, so the district court was correct to characterize them as "stray remarks in the workplace." Breeding, 164 F.3d at 1157; see also Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006) (decisionmakers' racially offensive statements not related to decisional process were stray comments, not strong evidence of discriminatory intent). We observe that Elnashar's counsel conceded as much at a motions hearing before the district court. Elnashar also finds evidence of discriminatory intent where Stehr and Schneider provided inaccurate information about his background to the FBI. He has no evidence, however, to contradict their deposition testimony that they honestly responded to the agents' questions to the best of their knowledge about Elnashar. As the district court explained, that the statements were incorrect does not give rise to a reasonable inference that Stehr and Schneider took adverse employment actions on account of Elnashar's race; the evidence indicates

-14-

these statements were simply innocent mistakes and were neither significant nor incriminating.

Elnashar also contends that SuperAmerica has manufactured its asserted reasons for his demotions after the fact to cover up a conspiracy to fire him. He doubts that SuperAmerica really had an hours-reduction policy in early 2002, pointing out that Stehr and Schneider never cut their hours and that Erickson does not remember ordering a district-wide reduction in hours. He further contends that the managers' testimony that Erickson ordered the demotions is inconsistent with company records because someone other than Erickson signed the "Employee Data Change Forms" that changed his title and cut his hours, and no one had Elnashar sign the forms as required by SuperAmerica policy. None of these arguments raises a genuine issue of material fact to support Elnashar's theory of pretext. That Stehr and Schneider's hours were not cut is not evidence of pretext, because Elnashar was not similarly situated to Stehr and Schneider, who outranked him. Erickson's inability to recall the hours-reduction policy does not dispute Stehr and Schneider's testimony that the policy existed. Finally, SuperAmerica's failure to comply with its communication policies in changing Elnashar's status, and that someone other than Erickson signed the formal documentation of those changes, may suggest that SuperAmerica was disorganized, but not that its asserted reasons for demoting Elnashar are pretext for a conspiracy to fire him on account of his race.

Elnashar also urged the district court to find pretext on the basis of his evidence that a SuperAmerica employee provided a false tip about him to the FBI. The district court found this theory to be totally unsubstantiated. As all of Elnashar's attempts to compel disclosure of the informant's identity had failed, his only evidence of this theory was his testimony that Agent Umbel told him that a SuperAmerica employee called the FBI to report that he was making bombs. The district court correctly concluded that this evidence was inadmissible hearsay and thus could not raise a genuine issue of material fact. Elnashar argues that the statement should have been

admitted through exceptions to the hearsay rule in Federal Rules of Evidence 804(b)(3) and 807. Like the district court, we reject this argument. First, Agent Umbel was not "unavailable" as required for the Rule 804(b)(3) statement against interest exception. To show that a witness is unavailable, the proponent of the hearsay statement must attempt in good faith to locate and subpoena the witness. United States v. Harbin, 112 F.3d 974, 975 (8th Cir. 1997). Elnashar served one subpoena on Agent Umbel, which was returned undelivered, and he made no other efforts to locate Umbel apart from his motion to compel the FBI to disclose Umbel's location. Nor has Elnashar shown the statement had circumstantial guarantees of trustworthiness as required for the Rule 807 residual exception. Because he lacks competent evidence that a SuperAmerica decision-maker falsely tipped the FBI that Elnashar was making bombs, this theory of pretext fails as a matter of law.

### 3. Reprimand

Elnashar also argues that SuperAmerica discriminated against him when Erickson issued him a written reprimand. Like the district court, we reject this theory because the reprimand was not an adverse employment action. A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse. Singletary v. Mo. Dep't of Corrections, 423 F.3d 886, 892 n.5 (8th Cir. 2005); Burchett v. Target Corp., 340 F.3d 510, 518-19 (8th Cir. 2003). The reprimand did not affect Elnashar's terms and conditions of employment, so he cannot make out a prima facie case on this claim.

### 4. Constructive discharge

Elnashar resigned his position at SuperAmerica after the reprimand but characterizes this as a constructive discharge, pointing to Schneider's poor treatment of him and to Erickson and Stehr's inadequate consideration of his side of the story. Constructive discharge occurs when an employer deliberately creates "intolerable working conditions with the intention of forcing the employee to quit" and the employee does quit. Breeding, 164 F.3d at 1159 (internal quotation marks and citation omitted). To show he was constructively discharged, Elnashar would have to show that a reasonable person in his situation would find the conditions intolerable and that SuperAmerica intended to force him to quit. Tatum v. Ark. Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005). Elnashar has not met either requirement. He argues that he had no choice but to quit because he reasonably believed there was no chance for fair treatment, Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997), but the facts simply do not support this claim. Elnashar never reported the details of his problems with Schneider to Stehr, but only requested that she train him instead of having Schneider do it, and he was neither persistent nor patient in his efforts to discuss the situation with Erickson. Moreover, when Schneider alleged that Elnashar racially harassed his coworker, Erickson investigated and found that Elnashar had done nothing wrong. Under these circumstances, it was not reasonable for Elnashar to believe he had no chance for fair treatment at SuperAmerica. The evidence shows only that he felt unfairly criticized and that his work conditions, particularly his encounters with Schneider, were unpleasant to him. Such conditions are not "so intolerable as to compel a reasonable person to resign," Breeding, 164 F.3d at 1160 (internal quotation marks omitted), and Elnashar's constructive discharge claim fails.

### 5. Hostile work environment

Finally, Elnashar claims that SuperAmerica subjected him to a hostile work environment at the Seventh Street store, again primarily because of Schneider's conduct.  To establish this claim, Elnashar would have to show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) a causal nexus exists between the harassment and his group membership; and (4) the harassment affected a term, condition, or privilege of his employment.  Gordon v. Schafer Contracting Co., 469 F.3d 1191, 1194-95 (8th Cir. 2006).  The district court concluded that Schneider's inquiries about harems and riding camels, as well as Elnashar's allegation that she made unwelcome physical contact with him at work, did not rise to the level of actionable harassment because they were isolated incidents that were not severe or pervasive.  The district court additionally concluded that SuperAmerica was entitled to dismissal of the hostile environment claim under Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998), because it had harassment policies in place and Elnashar failed to report Schneider's alleged harassment.  Because we agree that  Elnashar did not bring forth facts showing that the working conditions at the Seventh Street store were so severe or pervasive that they rose to the level of harassment, we affirm the grant of summary judgment to SuperAmerica on Elnashar's hostile environment claim without reaching his argument that SuperAmerica was not entitled to invoke the Faragher defense.

### III.

Because the evidence cannot support any reasonable inference of discrimination, SuperAmerica was entitled to summary judgment.  In addition, the district court did not abuse its discretion in refusing to grant a continuance and compel disclosure of additional evidence that Elnashar only speculated would save his case.  Thus, we affirm the judgment of the district court in all respects.

_____